# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF OHIO
### EASTERN DIVISION

| | | |
|---|---|---|
| ANDREW DATKO, | ) | CASE NO. 5:15-CV-2689 |
| | ) | |
| Plaintiff, | ) | JUDGE DAN AARON POLSTER |
| | ) | |
| v. | ) | MAGISTRATE JUDGE |
| | ) | JONATHAN D. GREENBERG |
| CAROLYN W. COLVIN, | ) | |
| Acting Commissioner | ) | |
| of Social Security, | ) | |
| | ) | **REPORT AND** |
| Defendant. | ) | **RECOMMENDATION** |

Plaintiff, Andrew Datko ("Plaintiff" or "Datko"), challenges the final decision of

Defendant, Carolyn W. Colvin, Acting Commissioner of Social Security ("Commissioner"),

denying his applications for Period of Disability ("POD"), Disability Insurance Benefits

("DIB"), and Supplemental Security Income ("SSI") under Titles II and XVI of the Social

Security Act, 42 U.S.C. §§ 416(i), 423, 1381 et seq. ("Act").  This Court has jurisdiction

pursuant to 42 U.S.C. § 405(g).  This case is before the undersigned United States Magistrate

Judge pursuant to an automatic referral under Local Rule 72.2(b) for a Report and

Recommendation.  For the reasons set forth below, the Magistrate Judge recommends that the

Commissioner's final decision be vacated and this matter be remanded for further proceedings.

## I.    PROCEDURAL HISTORY

On February 15, 2012, Plaintiff filed applications for POD, DIB, and SSI alleging a

disability onset date of June 1, 2010 and claiming he was disabled due to peripheral neuropathy.

(Transcript ("Tr.") 49).  The applications were denied initially and upon reconsideration, and Plaintiff requested a hearing before an administrative law judge ("ALJ").  (Tr. 196-97).

On March 24, 2015, the ALJ held a hearing, during which Plaintiff, represented by counsel, testified.  (Tr. 69-91).  An impartial vocational expert ("VE") testified.  (Tr. 69-91).  On April 6, 2015, the ALJ issued a written decision finding Plaintiff was not disabled.  (Tr. 50-66). The ALJ' s decision became final on October 28, 2015, when the Appeals Council declined further review.  (Tr. 1-6).

On December 23, 2015, Plaintiff filed his complaint to challenge the Commissioner's final decision.  (Doc. No. 1).  The parties have completed briefing in this case.  (Doc. Nos. 15, 16).  Datko asserts the following assignments of error:

> (1)  The ALJ's rejection of the treating physician's opinion is not supported by substantial evidence;
>
> (2) The ALJ erred in relying on vocational expert testimony provided in response to an incomplete hypothetical question
>
> (3) Remand is proper for the consideration of new and material evidence.

(Doc. No. 15 at 1).

## II.    EVIDENCE

### A.        Personal and Vocational Evidence

Plaintiff was born on February 6, 1951.  (Tr. 282).  He completed one year of college, and he is able to communicate in English.  (Tr. 287).  He has past relevant work as a certified nurse assistant and telemarketer.  (Tr. 372).

2

**B.       Medical Evidence - Physical Impairments**

On May 3, 2010, Plaintiff established care with his treating physician Katherine Sheridan, M.D.  (Tr. 443).  Plaintiff reported "no major complaints today."  (Tr. 443).  Medical history included neuropathy of the hands and feet.  (Tr. 443).  Plaintiff reported occasional "swelling in his legs and feet, which he attributes to neuropathy."  (Tr. 443).  On examination, Plaintiff was hypertensive, and Dr. Sheridan noted that "mild clubbing of right toe is also appreciated."  (Tr. 444).  Dr. Sheridan diagnosed "questionable peripheral neuropathy per history." (Tr. 444).  The only medication reported was over-the-counter sinus medication.  (Tr. 443).

On January 18, 2011, Plaintiff presented to Dr. Sheridan.  (Tr. 406-07).  His complaints included lumbar back pain.  (Tr. 406-07).  On examination, Dr. Sheridan noted mild tenderness and back spasms. (Tr. 407).  Heat was recommended for his back spasms. (Tr. 407).  On April 19, 2011,  Plaintiff again presented to Dr. Sheridan with moderate but worsening bilateral foot pain.  (Tr. 403).  Plaintiff was referred to a program that assisted with obtaining Neurontin for his nerve pain.  (Tr. 403).  On June 20, 2011, Plaintiff reported symptom improvement.  He complained about the side effects from Neurontin, but he reported the side effects were tolerable.  (Tr. 417).  On July 28, 2011, Dr. Sheridan saw Plaintiff, and he reported tingling, heaviness, and pain in his bilateral lower extremities, but he indicated that his symptoms were improving.  (Tr. 400).  He did not report any numbness or paresthesia.  (Tr. 400).

In February 2012, Plaintiff had to perform community service, and he asked Dr. Sheridan for a doctor's note indicating that he could not be on his feet and that he would need to do service sitting down.  (Tr. 415).

3

On March 13, 2012, Plaintiff visited the emergency department for left hip and left knee pain after he slipped and fell at home.  (Tr. 389-90).  Plaintiff had normal range of motion, normal strength, no tenderness, no swelling, no deformity, normal motor activity, and normal coordination.  (Tr. 390).  His diagnosis was hip contusion and hip sprain.  (Tr. 390).

On April 19, 2012, Plaintiff reported to Dr. Sheridan that he was using a family member's walker for his neuropathy.  (Tr. 397).  Plaintiff requested a prescription for a four pronged cane.  (Tr. 397).  On July 9, 2012, Plaintiff sought a prescription for a handicap placard. (Tr. 413).  On October 19, 2012, Plaintiff presented to Dr. Sheridan and complained of tingling, lower extremity pain, and heaviness.  (Tr. 479).  He described his symptoms as improving.  (Tr. 479).  Plaintiff demonstrated good compliance with treatment, fair tolerance of treatment, and good symptom control.  (Tr. 479).  A broad-based, limping, and antalgic, and slow and cautious gait was observed.  (Tr. 479).  On December 21, 2012, Dr. Sheridan saw Plaintiff and he again reported tingling, lower extremity pain, and heaviness.  (Tr. 478).  Plaintiff also reported that Neurontin caused increased sleepiness, but he had fair tolerance of the medication.  (Tr. 478).  Plaintiff reported that the medication was helping, especially with his feet, but he complained of more pain in his hands.  (Tr. 478).

On March 11, 2013, Plaintiff reported symptoms included worsening tingling, lower extremity pain, and heaviness.  (Tr. 476).  Plaintiff complained of joint stiffness in his right hand and both feet.  (Tr. 476).  Dr. Sheridan noted Plaintiff's functional limitations included his walking ability.  (Tr. 476).  It was noted that Plaintiff used a cane and that his gait "was" limping.  (Tr. 476).  On his neurologic exam, Dr. Sheridan noted sensation was "absent almost diffusely on bilateral feet plantar surfaces" and "[d]iminished to absent on dorsal aspect of

4

bilateral feet as well as ankles." (Tr. 476). She also indicated there was "significant worsening of exam compared to when I did it 3 yrs ago and it was basically normal." (Tr. 476). An EMG/Nerve conduction test of the right lower limb was "abnormal" and "consistent with a sensorimotor peripheral polyneuropathy that seems to be predominantly sensory and axonal." (Tr. 489).

On June 11, 2013, Plaintiff described worsening symptoms which included numbness, tingling, and lower extremity pain. (Tr. 542). Symptoms were reportedly exacerbated by walking, standing, and sitting. (Tr. 542). Functional limitations included walking ability. (Tr. 542). Joint stiffness of the right hand was described as moderate to severe and lasting all day. (Tr. 542). Movement was an aggravating factor. (Tr. 542). On exam, Dr. Sheridan found Plaintiff's right hand joints to be "very boggy," but all hand joints were non-tender to palpation and without redness or warmth. (Tr. 543).

In December 2013, Plaintiff complained of worsening symptoms in his right hand. (Tr. 550). Functional limitations included walking ability. (Tr. 550). There was a medication change: Neurontin was discontinued, and Plaintiff started with Gabapentin and Lyrica. (Tr. 543). On January 24, 2014, it was reported that the Lyrica was helping. (Tr. 557). Gabapentin reportedly caused drowsiness. (Tr. 561).

On April 8, 2014, the treatment note indicated that symptoms included numbness, tingling, and lower extremity pain. (Tr. 561). Plaintiff reported that symptoms were improving. (Tr. 561). Functional limitations again included "walking ability." (Tr. 561). In October 2014, Plaintiff presented to Dr. Sheridan and reported his symptoms as "unchanged (stable)." (Tr. 566). Functional limitations included difficulty with general activity and walking ability. (Tr.

566).  Dr. Sheridan indicated that symptoms were "somewhat controlled" by Lyrica, but ambulation was still difficult.  (Tr. 567).

Plaintiff was seen by Dr. Sheridan on February 5, 2015.  Plaintiff described worsening symptoms.  (Tr. 564).  Symptoms included numbness, tingling, and pain.  Plaintiff experienced symptoms in the left hand, fingers, foot, and toes, and in the right hand, fingers, and hip.  (Tr. 564).  The pain was described as aching or tingling.  (Tr. 564).  On examination, Plaintiff had normal muscle strength in his left and right upper extremities, and normal grip strength.  (Tr. 565).

### C.       Dr. Sheridan's Medical Source statement

On February 5, 2015, Dr. Sheridan filled out a medical source statement relating to Plaintiff's ability to perform work-related functions.  (Tr. 569-70).  Dr. Sheridan diagnosed Plaintiff with idiopathic peripheral neuropathy.  (Tr. 570).  She opined that Plaintiff was able to stand up and/or walk continuously for less than fifteen (15) minutes at a time; stand up and/or walk for a total of less than one (1) hour during an eight (8) hour day; sit in a working position continuously for less than  fifteen (15) minutes; and sit for a total of one (1) hour in an eight (8) hour day.  (Tr. 569).  Dr. Sheridan further opined that Plaintiff required more than four (4) hours of rest (either lying down, reclining, or sitting on an easy chair) during an eight-hour work day.  (Tr. 569).

Dr. Sheridan stated that Plaintiff could only occasionally lift no more than ten (10) pounds.  In terms of repetitive movement, she noted that Plaintiff was able to reach frequently with either arm but grasp or finger rarely with the right or left hand.  (Tr. 570).  She opined that

6

Plaintiff could rarely use either foot in repetitive movements of leg controls; and that Plaintiff could occasionally bend, but rarely squat, crawl, or climb.  (Tr. 570).

    **D.**        **State Agency Reports - Physical Impairments**

        **1. Lokendra Sahgal, M.D.**

In August 2012, Lokendra Sahgal, M.D. examined Plaintiff at the request of the state agency.  (Tr. 447-54).  Plaintiff reported neuropathy in his legs, feet, and hands; difficulty walking, with use of a cane; weakness in both arms and both legs, but primarily on the right side; previous diagnoses of degenerative joint disease and degenerative disk disease in his lumbar spine; and a previous osteoporosis diagnosis.  (Tr. 447).  Plaintiff reported that all his symptoms were getting worse over the previous two years.  (Tr. 447).

Plaintiff complained of stiffness and tingling in his hands.  (Tr. 447).  He reported difficulty picking up and holding objects, noting that a cup of tea had slipped from his hand earlier that day.  (Tr. 447).  He was unable to hold a pen to write.  (Tr. 447).  Plaintiff reported back pain down to his leg, primarily on the right side.  (Tr. 447).  He complained that his feet felt cold and heavy, and he indicated that his medication (Neurontin) was not helping.  (Tr. 447).

Dr. Saghal observed that Plaintiff had great difficulty getting on and off the examination table.  (Tr. 448).  On examination, Plaintiff "had decreased sensation in his right leg, mostly on the outer aspect," and "compared to the left leg he [had] decreased sensation in both lateral and medial aspects of the right leg."  (Tr. 448).  Dr. Saghal indicated that "in the right thigh there was some muscular atrophy."  Further, he stated that

> his gait was not normal; it was very slow and cautious.  He was hardly able to walk without the cane.  With a quad can, he was able to walk very slowly from the examination table to the door and complained of pain.  He definitely needed a quad cane to ambulate as his gait was not normal.

7

(Doc. 448).  Plaintiff had reduced muscle strength in his right upper extremity and normal muscle strength in his left upper extremity.  (Tr. 449, 551).  The first reading with the dynamometer showed right hand at sixty five (65) pounds and left hand at fifty-five (55) pounds.  A second reading showed the right hand at zero and the left hand at twenty five pounds.  (Tr. 449, 451).  Dr. Saghal indicated that muscle testing is not very reliable, noting that Plaintiff got tired very easily and complained of hand cramps.  (Tr. 449).  Dr. Saghal observed that Plaintiff did not try to squeeze the dynamometer the second time and that "[t]he grasp, manipulation, pinch, and fine coordination in the right hand was not normal."

Dr. Sahgal diagnosed a history of chronic low back pain with degenerative disk disease and a history of osteoporosis.  (Tr. 449).  He opined that "clinically there is neuropathy with motor weakness and sensory loss in the right leg and muscular atrophy in the right leg."  (Tr. 449).  Dr. Saghal opined that "[t]his person definitely needed a cane to ambulate."  (Tr. 449).  He concluded that Plaintiff was impaired, being limited to a less than full range of sedentary work.  In particular, he noted that Plaintiff's grasp with the right hand was poor and that Plaintif is unable to lift or carry anything.

### 2. Rannie Amiri, M.D.

In February 2013, Rannie Amiri, M.D., a state agency physician reviewed the record evidence and opined that Plaintiff did not have a severe impairment.  (Tr. 103-05).

### 3. Abraham Miklov, M.D.

In October 2013, Abraham Mikalov, M.D., a state agency physician, reviewed the record evidence and provided an assessment.  Dr. Mikalov opined that Plaintiff was able to lift and/or carry twenty (20) pounds occasionally and lift and/or carry ten (10) pounds frequently; stand

8

and/or walk (with normal breaks) for six (6) hours in an 8-hour day; and sit for six (6) hours in an 8-hour work day.  He opined that Plaintiff's ability to push or pull was limited in his lower right extremities.  He could occasionally climb ramps and stairs; never climb ladders, ropes, or scaffolds; occasionally balance; frequently kneel, crouch, and crawl; should avoid hazards, unprotected heights; and had no manipulative limitations.  (Tr. 135-37).

### E. Other Evidence

The record includes a January 2013 report from the Cooperative Disability Investigations Unit.  (Tr. 455-464).  According to the report, the claimant's cane prescription had been altered (Tr. 458); one of Plaintiff's neighbors stated that Plaintiff was able to walk without a cane (Tr. 460); and another neighbor reported that Plaintiff was not able to walk without a cane.  (Tr. 461). Notably, the ALJ gave "no weight to the investigative findings [of the January 2013 report] because they did contained [sic] only subjective assessments of the claimant's function from lay observers, providing little insight into the claimant's medical condition."  (Tr. 58).

### F.     Hearing Testimony

During the hearing, Plaintiff testified to the following:

- •     that he was on two medications, Ranitidine for indigestion and Lyrica for neuropathy.  (Tr.75, 82).

- •     that the doctor wanted him to take two or three pills per day, but that "one pill is enough."  (Tr. 75).

- •     that he last worked full time in 2009, and that he held temporary jobs in 2010 and 2011  (Tr. 76).

- •     that he could only sit for 20 to 25 minutes before his feet fell asleep and he had to get up and walk around.  (Tr. 77-78, 83-84).

- •     that he had been using a cane for about four years.  (Tr. 80).

9

- that he had difficulty lifting, handling, and carrying things around the house. Plaintiff testified that a coffee cup slipped out of his hand the morning of the hearing.  (Tr. 81).

- that he had difficulty standing and used two canes to help with his balance.  (Tr. 78, 80).

- that his activities included trying to pick up around the house, occasionally cooking, and grocery shopping.  (Tr. 78-79, 82-83).

- that he seldom drove and that he was afraid to lift anything heavy because he had problems with his right hand and was he afriad he would drop something. (Tr. 79, 81).

The ALJ noted that Plaintiff had past work as a phone solicitor and posed the following three hypotheticals to the VE:

The first hypothetical assumed an individual born in February 1951, with a high school education who is able to lift, carry, push and pull ten pounds occasionally, and five pounds frequently.  The hypothetical individual could stand and walk for no more than two hours per day total; never kneel or crawl or climb ladders, ropes or scaffolds, occasionally stoop, crouch, or climb ramps and stairs; and never using vibrating hand tools.  The individual should avoid workplace hazards, such as unprotected heights, or exposure to dangerous moving machinery. The VE testified that such an individual would be able to perform Plaintiff's past work as a phone solicitor, as that job is normally performed in the national economy.

The second hypothetical assumed all the limitations of the first hypothetical and included an additional limitation, that the individual was capable of sitting for no more than four (4) hours total in an eight-hour day.  The VE testified that such an individual would not be able to perform Plaintiff's past relevant work.

10

A third hypothetical added that the individual would need to stand up from sitting every fifteen (15) minutes for a minute or two, during which time the worker would be off task.  The VE testified that the third hypothetical worker would be unable to perform Plaintiff's past relevant work.

### III.    STANDARD FOR DISABILITY

In order to establish entitlement to DIB under the Act, a claimant must be insured at the time of disability and must prove an inability to engage "in substantial gainful activity by reason of any medically determinable physical or mental impairment," or combination of impairments, that can be expected to "result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 20 C.F.R. §§ 404.130, 404.315 and 404.1505(a).1

A disabled claimant may also be entitled to receive SSI benefits.  20 C.F.R. § 416.905; *Kirk v. Sec'y of Health & Human Servs.*, 667 F.2d 524 (6th Cir. 1981).  To receive SSI benefits, a claimant must meet certain income and resource limitations.  20 C.F.R. §§ 416.1100 and 416.1201.

The Commissioner reaches a determination as to whether a claimant is disabled by way of a five-stage process.  20 C.F.R. §§ 404.1520(a)(4) *and* 416.920(a)(4).  *See also Ealy v. Comm'r of Soc. Sec.*, 594 F.3d 504, 512 (6th Cir. 2010);  *Abbott v. Sullivan*, 905 F.2d 918, 923 (6th Cir. 1990).  First, the claimant must demonstrate that he is not currently engaged in "substantial gainful activity" at the time of the disability application.  20 C.F.R. §§ 404.1520(b) *and* 416.920(b).  Second, the claimant must show that he suffers from a "severe impairment" in order to warrant a finding of disability.  20 C.F.R. §§ 404.1520(c) *and* 416.920(c).  A "severe impairment" is one that "significantly limits . . . physical or mental ability to do basic work

11

activities." *Abbot*, 905 F.2d at 923.  Third, if the claimant is not performing substantial gainful activity, has a severe impairment that is expected to last for at least twelve months, and the impairment, or combination of impairments, meets or medically equals a required listing under 20 CFR Part 404, Subpart P, Appendix 1, the claimant is presumed to be disabled regardless of age, education or work experience. *See* 20 C.F.R. §§ 404.1520(d) *and* 416.920(d).  Fourth, if the claimant's impairment or combination of impairments does not prevent him from doing his past relevant work, the claimant is not disabled.  20 C.F.R. §§ 404.1520(e)-(f) *and*  416.920(e)-(f). For the fifth and final step, even if the claimant's impairment does prevent him from doing his past relevant work, if other work exists in the national economy that the claimant can perform, the claimant is not disabled.  20 C.F.R. §§ 404.1520(g), 404.1560(c), *and* 416.920(g).

Here, Plaintiff was insured on his alleged disability onset date, June 1, 2010 and remained insured through June 30, 2014, his DLI.  (Tr. 82).  Therefore, in order to be entitled to POD and DIB, Datko must establish a continuous twelve month period of disability commencing between these dates.  Any discontinuity in the twelve month period precludes an entitlement to benefits.  *See Mullis v. Bowen*, 861 F.2d 991, 994 (6th Cir. 1988); *Henry v. Gardner*, 381 F.2d 191, 195 (6th Cir. 1967).

### IV.    SUMMARY OF COMMISSIONER'S DECISION

The ALJ made the following findings of fact and conclusions of law:

1.    The claimant meets the insured status requirements of the Social Security Act through June 30, 2014

2.    The claimant has not engaged in substantial gainful activity since June 1, 2010, the alleged onset date.  (20 CFR 404.1571 et seq and 416.971 et seq)

12

3.        The claimant has the following severe impairments: peripheral neuropathy and osteoarthritis (20 CFR 404.152(c) and 416.920(c)).

4.        The claimant does not have an impairment or combination of impariments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1

5.        After careful consideration of the entire record, I find that the claimant has the residual functional capacity to perform sedentary work as defined in 20 CFR 404.1567(a) and 416.967(a) except he cannot climb ladders, ropes, or scaffolds.  He can occasionally stoop, crouch, and climb ramps or stairs.  The claimant cannot kneel or crawl.  He must avoid workplace hazards, such as unprotected heights or dangerous moving machinery.  He cannot use vibrating hand tools.

6.        The claimant is capable of performing past relevant work as a phone solicitor.  This work does not require the performance of work-related activities precluded by the claimant's residual functional capacity

7.        Claimant has not been under a disability, as defined by the Scoial Security Act, from June 1, 2010, through the date of this decision

(Tr. 55-60).

## V.  STANDARD OF REVIEW

"The Social Security Act authorizes narrow judicial review of the final decision of the Social Security Administration (SSA)."  *Reynolds v. Comm'r of Soc. Sec.*, 2011 WL 1228165 at *2 (6th Cir. April 1, 2011).  Specifically, this Court's review is limited to determining whether the Commissioner's decision is supported by substantial evidence and was made pursuant to proper legal standards.  *See Ealy v. Comm'r of Soc. Sec.*, 594 F.3d 504, 512 (6th Cir. 2010); *White v. Comm'r of Soc. Sec.*, 572 F.3d 272, 281 (6th Cir. 2009).  Substantial evidence has been defined as "'more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'"  *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007) (quoting *Cutlip v. Sec'y of Health and Human Servs.*, 25 F.3d 284, 286 (6th Cir. 1994)).  In determining whether an ALJ's findings are

13

supported by substantial evidence, the Court does not review the evidence *de novo*, make

credibility determinations, or weigh the evidence. *Brainard v. Sec'y of Health & Human Servs.*,

889 F.2d 679, 681 (6th Cir. 1989).

Review of the Commissioner's decision must be based on the record as a whole. *Heston

v. Comm'r of Soc. Sec.*, 245 F.3d 528, 535 (6th Cir. 2001).  The findings of the Commissioner

are not subject to reversal, however, merely because there exists in the record substantial

evidence to support a different conclusion. *Buxton v. Halter*, 246 F.3d 762, 772-3 (6th Cir.

2001) (citing *Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986)); *see also Her v. Comm'r of

Soc. Sec.*, 203 F.3d 388, 389-90 (6th Cir. 1999)("Even if the evidence could also support another

conclusion, the decision of the Administrative Law Judge must stand if the evidence could

reasonably support the conclusion reached.")  This is so because there is a "zone of choice"

within which the Commissioner can act, without the fear of court interference. *Mullen*, 800 F.2d

at 545 (citing *Baker v. Heckler*, 730 F.2d 1147, 1150 (8th Cir. 1984)).

In addition to considering whether the Commissioner's decision was supported by

substantial evidence, the Court must determine whether proper legal standards were applied.

Failure of the Commissioner to apply the correct legal standards as promulgated by the

regulations is grounds for reversal.  *See, e.g.,White v. Comm'r of Soc. Sec.*, 572 F.3d 272, 281

(6th Cir. 2009); *Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 746 (6th Cir. 2006) ("Even if

supported by substantial evidence, however, a decision of the Commissioner will not be upheld

where the SSA fails to follow its own regulations and where that error prejudices a claimant on

the merits or deprives the claimant of a substantial right.")

14

## VI.  ANALYSIS

**A.**      **First Assignment of Error: Treating Physician Rule**

The treating physician rule requires that a treating source opinion must be given "controlling weight" if such opinion (1) "is well-supported by medically acceptable clinical and laboratory diagnostic techniques" and (2) "is not inconsistent with the other substantial evidence in [the] case record." *Meece v. Barnhart*, 2006 WL 2271336 at *4 (6th Cir. Aug. 8, 2006); 20 C.F.R. § 404.1527(c)(2).  However, "a finding that a treating source medical opinion . . . is inconsistent with the other substantial evidence in the case record means only that the opinion is not entitled to 'controlling weight,' not that the opinion should be rejected." *Blakley v. Comm'r of Soc. Sec.*, 581 F.3d 399 (6th Cir. 2009) (quoting Soc. Sec. Rul. 96-2p, 1996 SSR LEXIS 9 at *9); *Meece*, 2006 WL 2271336 at * 4 (Even if not entitled to controlling weight, the opinion of a treating physician is generally entitled to more weight than other medical opinions).  Indeed, "[t]reating source medical opinions are still entitled to deference and must be weighed using all of the factors provided in 20 C.F.R. § 404.1527 and 416.927." *Blakley*, 581 F.3d at 408.[1]

If the ALJ determines a treating source opinion is not entitled to controlling weight, "the ALJ must provide 'good reasons' for discounting [the opinion], reasons that are 'sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating

---

[1] Pursuant to 20 C.F.R. § 404.1527(c)(2), when not assigning controlling weight to a treating physician's opinion, the Commissioner should consider the length of the relationship and frequency of examination, the nature and extent of the treatment relationship, how well-supported the opinion is by medical signs and laboratory findings, its consistency with the record as a whole, the treating source's specialization, the source's familiarity with the Social Security program and understanding of its evidentiary requirements, and the extent to which the source is familiar with other information in the case record relevant to the decision.

source's medical opinion and the reasons for that weight.'" *Rogers v. Comm'r of Soc. Sec.*, 486

F.3d 234, 242 (6th Cir. 2007) (quoting Soc. Sec. Ruling 96-2p, 1996 SSR LEXIS 9 at * 5). *See*

*also Gayheart*, 710 F.3d at 376. The purpose of this requirement is two-fold. First, a

sufficiently clear explanation "'let[s] claimants understand the disposition of their cases,'

particularly where a claimant knows that his physician has deemed him disabled and therefore

'might be bewildered when told by an administrative bureaucracy that she is not, unless some

reason for the agency's decision is supplied.'" *Id.* (quoting *Wilson v. Comm'r of Soc. Sec.*, 378

F.3d 541, 544 (6th Cir. 2004)). Second, the explanation "ensures that the ALJ applies the

treating physician rule and permits meaningful appellate review of the ALJ's application of the

rule." *Wilson*, 378 F.3d at 544. Because of the significance of this requirement, the Sixth

Circuit has held that the failure to articulate "good reasons" for discounting a treating

physician's opinion "denotes a lack of substantial evidence, even where the conclusion of the

ALJ may be justified based upon the record." *Rogers*, 486 F.3d at 243.[2]

In this case, there is no question that Dr. Sheridan qualifies as Plaintiff's treating

physician under the regulations. *See* 20 C.F.R. § 404.1502 (A physician qualifies as a treating

source if the claimant sees him "with a frequency consistent with accepted medical practice for

the type of treatment and/or evaluation required for [the] medical condition."). Plaintiff was

seen by Dr. Sheridan on numerous occasions over a period of years beginning in October 2010.

---

[2] "On the other hand, opinions from nontreating and nonexamining sources are never
assessed for 'controlling weight.' The Commissioner instead weighs these opinions
based on the examining relationship (or lack thereof), specialization, consistency, and
supportability, but only if a treating-source opinion is not deemed controlling. 20 C.F.R.
§ 404.1527(c). Other factors 'which tend to support or contradict the opinion' may be
considered in assessing any type of medical opinion. *Id.* § 404.1527(c)(6)." *Gayheart*,
710 F.3d at 376.

16

By February 2015, Dr. Sheridan concluded that Plaintiff was unable to perform a full range of sedentary work.  Specifically, Dr. Sheridan opined that Plaintiff was able to sit for less than fifteen (15) minutes continuously, one (1) hour total, and requires rest for a total of more than four (4) hours during an eight-hour workday.

The ALJ concluded that Dr. Sheridan's opinion was entitled to "little weight" based on the following analysis:

> I do not give controlling weight to Dr. Sheridan's opinion.  Although the claimant had ongoing neuropathy symptoms, the evidence did not establish the near complete inability to perform work tasks that she described.  He was encouraged to exercise by his physicians and he performed a variety of daily activities, including cooking and doing household chores.  Moreover, the claimant did not exhibit the severe upper extremity dysfunction that would preclude him from performing manipulative activities.  Given the lack of evidentiary support, I give little weight to Dr. Sheridan's opinion.

(Tr. 59).  Also relevant to this analysis, according to the Commissioner, is the ALJ's assertion that "the record failed to establish substantial ongoing grip deficits and he did not offer consistent complaints about dropping objects, as he alleged."  (Tr. 59).

On review of the record and the ALJ's decision, the undersigned concludes that the ALJ failed to provide the required "good reasons" to justify his decision to discount Dr. Sheridan's opinion.  To begin with, the ALJ was incorrect to conclude that Plaintiff's performance of daily activities and Dr. Sheridan's recommendation that Plaintiff exercise are inconsistent with, and thus undermine, Dr. Sheridan's opinion.  The record shows that on January 24, 2014, Plaintiff inquired about the potential benefits of exercise.  (Tr. 558).  In an email response sent the same day, Dr. Sheridan stated,

17

> Any exercise would probably be beneficial to help his leg strength and walking ability. Would need to start out slowly, and probably start out [with a] cane at first.  He probably would do best in water (pool) . . . ."

(Tr. 558).

The fact that Dr. Sheridan suggested exercise (by starting out slowly with a cane or ideally in water) cannot reasonably be construed as evidence that would undercut Dr. Sheridan's opinion.  There is no evidence that Plaintiff ever attempted to exercise, and, even if there were, there is no logical basis for the conclusion that an individual capable exercising with a cane or in a swimming pool is also able to perform sedentary work as defined under the social security regulations.  The evidence cited by the ALJ is not inconsistent with Dr. Sheridan's opinion, and the fact that Plaintiff inquired about the benefits of exercise does not suggest that his limitations were not as severe as Dr. Sheridan opined.

The ALJ also asserts that Dr. Sheridan's opinion is undermined by the fact that Plaintiff "performed a variety of daily activities, including cooking and doing household chores."  On review of the record, it is evident that the ALJ mistook the extent of Plaintiff's daily activities. At the hearing, Plaintiff testified that he *can* cook, but he does not cook often

> because I'm afraid of anything heavy. Sometimes I can't hold a coffee cup in my hand because my right hand will stiffen up, and at our house we have cast iron skillets and stuff like that, and they're kind of heavy and I don't want to drop it and burn myself, and stuff like that, you know, so I just wait until she comes - -

(Tr. 79).  Plaintiff noted that during the day he tries to pick up around the house, but only with some difficulty.  Plaintiff also testified that his sister did the laundry for him; that he seldom drives a car; and that he occasionally goes grocery shopping with his sister, but he uses a motorized wheelchair.  This evidence, while indicating that Plaintiff was capable of some physical activity, does not undermine Dr. Sheridan's opinion, as these activities are not

18

comparable to typical work activities over an eight-hour period.  *See Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 248 (6th Cir. 2007) (Typical or basic work activities refer to "the abilities and aptitudes necessary to do most jobs," including among other things "walking, standing, sitting, lifting, pushing, pulling, reaching carrying, or handling."); *see also Meece v. Barnhart*, 192 F. App'x 456, 465 (6th Cir. 2006) ("Plaintiff's ability to engage in these intermittent activities of relatively short duration does not negate the fact that Plaintiff is unable to regularly engage in work due to his pain.").

Finally, the ALJ cites a lack of evidentiary support for Dr. Sheridan's opinion, stating that "the claimant did not exhibit the severe upper extremity dysfunction that would preclude him from performing manipulative activities."  Having carefully considered the record, the undersigned concludes that given the amount of record evidence documenting treatment of Plaintiff's upper extremity dysfunction, the ALJ's cursory explanation does not amount to a "good reason" for affording Dr. Sheridan's opinion "little weight."

While the ALJ noted that "the record failed to establish substantial ongoing grip deficits and [that Plaintiff] did not offer consistent complaints about dropping objects," Plaintiff's neuropathic symptoms in the upper extremities is well-documented over a period of several years.  In May 2010, Dr. Sheridan noted that Plaintiff's medical history included neuropathy in the hands and feet.  In August 2012, Dr. Sahgal, a state agency consultant, examined the Plaintiff.  Plaintiff complained of stiffness and tingling in his hands and difficulty picking up and holding objects.  Dr. Saghal observed that Plaintiff was unable to hold a pen to write.  Dr. Saghal determined that "the grasp, manipulation, pinch, and fine coordination in the right hand was not normal, [but] the left hand was normal."  Dr. Saghal opined that Plaintiff 's "ability to to do

19

lifting or carrying is definitely impaired.  This person had a hard time just walking with a quad

cane.  He will not be able to lift or carry anything."  (Tr. 449).

On December 21, 2012, Plaintiff complained of more pain in his hands.  The complaint

was assessed as idiopathic peripheral neuropathy, and Dr. Sheridan noted joint pain and joint

stiffness.  (Tr. 478).  On March 11, 2013, Dr. Sheridan again noted joint stiffness in the right

hand and both feet.  (Tr. 476).  In June 2013, Plaintiff complained of worsening symptoms, and

the treatment notes state that:

> [t]he onset of the joint stiffness has been gradual.  The joint stiffness is described as
> moderate to severe.  The joints affected include the right hand.  No associated
> symptoms were reported.  Aggravating factors include movement (motion).  The joint
> stiffness is relieved by ice.  Note for "Joint stiffness": stiffness lasts all day long. Has
> not noticed any joint redness or warmth.

(Tr. 542).  Dr. Sheridan examined Plaintiff and noted that "[r]ight 3rd PIP joint and left 1st PIP

joints very boggy.  All of hand joints nontender to palpation and without redness or warmth."

(Tr. 543).  In December 2013, Plaintiff presented to Dr. Sheridan and complained of worsening

symptoms in his right hand.  In April 2014, Dr. Sheridan again assessed peripheral neuropathy in

the hands and feet but noted some improvement with medication.  (Tr. 562).  In October 2014,

symptoms were reported as unchanged.  In February 2015, Plaintiff described worsening

symptoms of numbness, tingling, and pain in the left hand, fingers, foot, and toes, and in the

right hand, fingers, and hip.  On examination, Plaintiff had normal muscle strength in his left and

right upper extremities, and normal grip strength.  (Tr. 565).

The record, as described above, shows that over a period of years Plaintiff sought

treatment for upper extremity dysfunction.  Dr. Sheridan's opinion that Plaintiff could rarely

grasp or finger with the left or right hand is in no way conclusory, and it has meaningful support

in the record.  In deciding that Dr. Sheridan's opinion had little weight, the ALJ merely stated, "the claimant did not exhibit the severe upper extremity dysfunction that would preclude him from performing manipulative activities."  The ALJ failed to comprehensively explain, or cite any credible evidence in support of, his decision to discount Dr. Sheridan's opinion.  While there may be substantial evidence in the record to support the ALJ's decision to give Dr. Sheridan's opinion "little weight," the ALJ failed to state with the required specificity how this is the case. *See Hensley v. Astrue*, 573 F.3d 263, 267 (6th Cir.2009) (even when there is substantial evidence to support the ALJ's conclusion, "[w]e do not hesitate to remand when the Commissioner has not provided 'good reasons' for the weight given to a treating physician's opinion").

Furthermore, review of the ALJ's decision reveals two discrepancies in the weighing of medical sources, which underscore the ALJ's failure to provide the required "good reasons." First, in addition to being Plaintiff's treating physician, Dr. Sheridan was the only physician who actually examined Plaintiff besides Dr. Saghal.  And, notably, Dr. Saghal's overall assessment was consistent with the opinion of Dr. Sheridan.  As discussed *supra* Sec. II.D.1., Dr. Saghal concluded that Plaintiff was impaired, being limited to a less than full range of sedentary work. He noted, in particular, that Plaintiff's grasp with the right hand was poor and that Plaintiff is unable to lift or carry anything.  It is not apparent how, despite this consistency, Dr. Sheridan's opinion was afforded as little weight as it was.

In addition, even though the ALJ found that the overall record was inconsistent with Dr. Saghal's opinion (Tr. 58), this is a situation in which Plaintiff "might be especially bewildered when told by an administrative bureaucracy that [he] is not [disabled]," *Wilson v. Comm'r of*

21

*Soc. Sec.*, 378 F.3d 541, 544 (6th Cir. 2004), since both Plaintiff's own doctor and the state agency physician said he was.

Second, the only source opinion that merited greater than "little weight" was that of a state agency consultant, Dr. Mikalov, who, without examining Plaintiff, concluded that Plaintiff was capable of light work.  There is a discrepancy in the manner in which Dr. Mikalov's opinion was weighted compared to how Dr. Sheridan's was weighted.  When assessing Dr. Mikalov's opinion, the ALJ noted that even though it was unsupported by the record in two respects, it was still entitled to "some weight" (which is greater than the weight afforded to Dr. Sheridan's opinion).  (Tr. 59).  This determination comes in contrast to the manner in which the ALJ viewed Dr. Sheridan's opinion.  Dr. Sheridan's opinion, like Dr. Mikalov's opinion, was found to be unsupported by the record in certain respects, but her opinion was afforded "little weight."

It is unclear why the ALJ reached the conclusion that these two source opinions, both of which are purportedly unsupported by the record in some respect, were to be weighted differently.  "As a general matter, an opinion from a medical source who has examined a claimant is given more weight than that from a source who has not performed an examination."  *Gayheart v. Comm'r of Soc. Sec.*, 710 F.3d 365, 375 (6th Cir. 2013) (citing 20 C.F.R. § 404.1502, 404.1527(c)(1)).  However, "a properly balanced analysis might allow the Commissioner to ultimately defer more to the opinions of consultative doctors than to those of treating physicians."  *Gayheart v. Comm'r of Soc. Sec.*, 710 F.3d 365, 379 (6th Cir. 2013).  The problem, in this instance, is that while there may be enough evidence in the record to support the Commissioner's decision, the ALJ failed to balance the analysis so as to "build an accurate and

logical bridge between the evidence and the result." *Fleischer v. Astrue*, 774 F. Supp. 2d 875, 877 (N.D. Ohio 2011) (quoting *Sarchet v. Chater,* 78 F.3d 305, 307 (7th Cir.1996).

Accordingly, it is recommended that on remand the ALJ reevaluate the opinion of Plaintiff's treating physician, provide specific reasons with citations to the record as to the weight afforded, if less than controlling weight is warranted.

**B.      Second Assignment of Error: ALJ erred in relying on VE testimony based on an incomplete hypothetical**

In his second assignment of error, Datko argues that the hypothetical question presented to the VE did not accurately represent his physical limitations. As described *supra* Sec II.F., the ALJ posed three hypotheticals to the VE. The VE testified that the first hypothetical worker would be able to perform Plaintiff's past relevant work, but that the second two hypothetical individuals would not. Plaintiff argues that the workers described in the second and third hypotheticals more accurately portray Plaintiff's physical impairments than the individual described in the first hypothetical. Plaintiff accordingly argues that the ALJ erred by adopted the first hypothetical and finding Plaintiff capable of performing past relevant work.

Plaintiff's argument, as correctly noted by the Commissioner, is essentially a challenge to the Commissioner's RFC finding. Since the undersigned recommends that this matter be remanded for reevaluation of the opinion of Plaintiff's treating physician, Plaintiff's RFC is subject to change. As such, it is unnecessary for the Court to address Plaintiff's second assignment of error.

C.     **Third Assignment of Error: Whether remand is appropriate for the consideration of new and material evidence**

In his third assignment of error, Plaintiff argues that new and material evidence should be considered on remand.  The evidence, which was submitted to the Appeals Council but not made part of the record before the ALJ, includes a report dated May 26, 2015 from Charles Zollinger, M.D., a neurologist (Tr. 31-35); a June 24, 2015 MRI of the cervical spine (Tr. 43-44); and a report dated July 20, 2015 from Mark A. Weiner, MD., a neurosurgeon.  (Tr. 40-42).

The Commissioner maintains that this evidence should not be considered on remand because Plaintiff has failed to demonstrate good cause for not having obtained it before the ALJ's decision was issued.  (Doc. 16 at 9-10).  Defendant further maintains that Plaintiff has not demonstrated that this evidence is material.  (Doc. 16 at 9-10).

The Commissioner's argument assumes a remand under sentence six of 42 U.S.C. § 405(g), which requires a showing that the evidence is "new" and "material" and that there is "good cause" for failing to incorporate this evidence in the prior record.  42 U.S.C. 405(g). However, in the Sixth Circuit, when a sentence-four remand has been deemed appropriate, as is the case here, a district court may remand with instructions to hear new evidence where the "good cause" requirement has not been met.  *See Faucher v. Sec'y of Health and Human Servs.*, 17 F.3d 171, 174  75 (6th Cir. 1994).

Because this matter should be remanded for reevaluation of the opinion of Plaintiff's treating physician and for a new RFC determination, the ALJ should consider all the available evidence that is relevant to those issues.  The undersigned accordingly recommends that the evidence which was submitted to the appeals council but not made part of the original record before the ALJ be considered on remand.

## VII.    CONCLUSION

For the foregoing reasons, the Magistrate Judge recommends that the Commissioner's final decision be VACATED and this matter be remanded for further proceedings consistent with this opinion.


 s/ Jonathan D. Greenberg
Jonathan D. Greenberg
United States Magistrate Judge

Date:  October 5, 2016

### OBJECTIONS

**Any objections to this Report and Recommendation must be filed with the Clerk of Court within fourteen (14) days after the party objecting has been served with a copy of this Report and Recommendation.  28 U.S.C. § 636(b)(1). Failure to file objections within the specified time may waive the right to appeal the District Court's order.  *See United States v. Walters*, 638 F.2d 947 (6th Cir. 1981); *Thomas v. Arn*, 474 U.S. 140 (1985), *reh'g denied*, 474 U.S. 1111 (1986).**